**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE AND JANE DOE**, | * | |
| Individually and as parents and next | * | |
| friends of JD, a minor child, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. AW-11-03229 |
| | * | |
| **THE BOARD OF EDUCATION** | * | |
| **OF PRINCE GEORGE'S COUNTY,** | * | |
| 14201 School Lane | * | |
| Upper Marlboro, Maryland 20772, | * | |
| | * | |
| and | * | |
| | * | |
| **KATHLEEN SCHWAB**, | * | |
| 9 Research Road Unit C | * | |
| Greenbelt, Maryland 20770, | * | |
| | * | |
| Defendants. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## <u>MEMORANDUM OPINION</u>

Plaintiffs John and Jane Doe, individually and as parents and next friends of JD, a minor child, bring this action against Defendants Kathleen Schwab and the Board of Education of Prince George's County. Plaintiffs assert a student-on-student sexual harassment claim under Title IX, along with supplemental state law claims for negligence and gross negligence. The following motions are pending before the Court: (1) Defendants' Motion for Summary Judgment; (2) Plaintiffs' Motion for Leave to File Surreply; and (3) Defendants' Motion to Strike Plaintiffs' Surreply. The Parties have fully briefed the matter. Also, the Court held a motions' hearing on October 8, 2013. After carefully reviewing the evidentiary record and the Parties' memoranda, as well as considering the arguments the Parties made at the hearing, the

Court **GRANTS** Defendants' Motion for Summary Judgment; **DENIES AS MOOT** Plaintiffs'

Motion for Leave to File Surreply; and **DENIES AS MOOT** Defendants' Motion to Strike

Plaintiffs' Surreply.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs enrolled their son, JD, in the fourth grade at Robert Goddard Montessori School

(Goddard) for the 2008-2009 school year. JD also attended Goddard as a fifth-grader for the

2009-2010 school year. Evidently, JD was nine or ten years old when most of the relevant events

occurred. Suzanne Johnson (Johnson) was the principal of Goddard for most of the 2008-2009

school year. Johnson passed away toward the end of the 2008-2009 school year. Defendant

Kathleen Schwab was vice principal of Goddard during the 2008-2009 school year. Upon

Johnson's death, Schwab apparently served as acting principal for the remainder of the 2008-

2009 school year. Then, Schwab served as Goddard's principal in the 2009-2010 school year. JD

was assigned to Lisa Jellison (Jellison)'s fourth-through-sixth-grade class for the two years he

attended Goddard. A nonparty student, Classmate, was in the same class during both school

years. Classmate was one grade ahead of and bigger than JD.

Plaintiffs allege that Classmate started to sexually harass JD in 2008. In the fall of 2008,

Classmate allegedly called JD gay at least once. Furthermore, in October 2008, JD told Schwab

that "someone had said something to him in the bathroom that was of a sexual nature." Doc. No.

42-5 at 101:13-19. Schwab testifies that, in response, she told JD that the students were supposed

to respect each other and instructed him to immediately inform his teacher of any further such

incidents. She also states that she informed JD's mother of her conversation with JD. *See id.* at

101–02.

In December 2008, in the classroom library, Classmate allegedly exposed himself to JD. Plaintiffs did not inform Schwab of this incident until late January 2009. In response, Schwab documented JD's complaint in a contemporaneous log and reported it to Johnson. Subsequently, pursuant to Johnson's orders, Jellison rearranged her class such that JD and Classmate were as far away from each other as possible and that Jellison had more visibility.

The next instance of sexual harassment occurred on March 11, 2009. On that date, during a classroom dancing exercise, Classmate evidently grabbed JD and made humping gestures toward him. Defendants promptly documented this incident as sexual harassment and gave Classmate a five-day in-school suspension for it. Defendants assert, and Plaintiffs do not contest, that the in-school suspension was served in Johnson's office.

The next instance of alleged sexual harassment occurred approximately nine months later. On December 7, 2009, JD reported that a partially nude Classmate had run into the bathroom and tried to climb into his stall a few days earlier. In response, Defendants interviewed two or three male students, all of whom apparently stated that they did not see JD and Classmate together in the bathroom at the relevant time. Subsequently, JD's father and a security officer watched video surveillance footage of the bathroom's entrance and found no conclusive proof that JD and Classmate were in the bathroom at the same time. Nevertheless, Defendants implemented a sign-in/sign-out procedure intended to ensure that JD and Classmate would not use the bathroom at the same time. Defendants also provided JD with a student escort to the bathroom. Shortly thereafter, JD refused to use the escort service, allegedly because other students teased him about it. After the bathroom stall incident, the record does not reflect that Plaintiffs reported any more incidents of sexual harassment to Defendants.

In the spring of 2010, JD's parents discovered that JD and Classmate had been texting each other. JD's parents had bought him a cell phone with texting capability. Somehow, Classmate obtained JD's number and started sending him text messages, to some of which JD responded. *See* Doc. No. 37-4 at 67. JD's mother found out that Classmate was in JD's contact list. Although she initially took the phone from him, she gave it back after apparently deleting Classmate as a contact. *See* Doc. No. 37-9 at 90–91. Later, JD's parents learned that Classmate had sent JD some sexually explicit pictures, possibly of men having sex. *See* Doc. No. 37-6 at 80–81; Doc. No. 40-10 at 2. Plaintiffs have identified no evidence that Classmate discussed sex acts he had performed on JD in these communications. *See* Doc. No. 37-4 at 67; Doc. No. 37-6 at 80–81; Doc. No. 37-9 at 90–91. Nor is there any evidence that JD responded to any of these messages.

The final instance of alleged sexual harassment became known in June 2010, after school had let out for the 2009-2010 academic term. Then, the police responded to a report that Classmate had sexually assaulted JD. Specifically, JD reported that Classmate "would corner him in either the library or bathroom at the school and force either oral or anal sex on him." Doc. No. 37-3 at 1. To corroborate this allegation, JD testified that, during his fourth-grade year, Classmate unsuccessfully attempted to force JD to perform oral sex on him in the bathroom. Doc. No. 40-18 at 54:14-21. JD further testified that, at an unspecified point in time during his fifth-grade year, Classmate entered the bathroom, slammed him into the wall, pulled his pants down, and performed oral sex on him. *See id.* at 57:2 – 58:3. Similarly, JD testified that, at some time during fifth grade, Classmate partially inserted his penis into JD's anus when they were in the bathroom. *See id.* at 77:21 – 78:4. JD concedes that he failed to inform school officials of

these alleged sexual assaults. *See id.* at 56:7-19, 58:15-17, 78:5-11. Likewise, save the June 2010 police report, JD admits that he failed to tell his parents about these incidents. *See id.*

The Prince George's County Police Department investigated Plaintiffs' report. A doctor performed a sexual assault exam on JD and found no signs of injury. In July 2010, a police detective separately interviewed Classmate and JD. Classmate made a suspect statement in which he alleged that he and JD participated in three sexual encounters. According to Classmate, the first encounter took place in the library during JD's fourth-grade year. During this encounter, Classmate alleges that he and JD slapped each other's buttocks and humped each other with their pants halfway down and underwear up. *See* Doc. No. 40-10 at 1. The second encounter, according to Classmate, took place in the bathroom next to the resource room. During this encounter, Classmate alleges that he and JD humped each other with their pants and underwear down by placing their exposed penises on or in each other's "butt[s]." *See id.* at 1–2. During the same encounter, Classmate alleges that he asked JD if JD wanted to suck his penis, to which JD responded affirmatively and proceeded to do. The third encounter, according to the statement, occurred in the bathroom next to the classroom of "Ms. Holmes." *Id.* at 2. Allegedly, the third encounter was similar to the second inasmuch as JD and Classmate humped each other in the same manner as they had during the second encounter. *See id.* Classmate does not state when the second and third encounters transpired. Plaintiffs have submitted no affidavit or deposition testimony from Classmate, whether in connection with the suspect statement or for any other purpose.

A police detective interviewed JD in the same month. The detective noted "several inconsistencies" in JD's statements. Doc. No. 37-3 at 3. Eventually, JD stated that his sexual acts with Classmate were "consensual." *Id.* Based on the detective's findings, the police closed the

case as "unfounded." *Id.* Essentially, JD testified that the acts were nonconsensual and that he lied to the detective out of nervousness, embarrassment, and/or confusion.

Plaintiffs assert that Defendants' alleged failure to protect JD from Classmate's conduct harmed JD. For instance, Plaintiffs declare that JD experienced a recurrence of encopresis, or fecal staining, in February 2010. Although JD had suffered from this condition when he was younger, Plaintiffs contend that it had been in remission for two years and that Classmate's conduct, and the resulting fear of using the school bathroom, caused its recrudescence. Furthermore, both a medical doctor and JD's therapist diagnosed him as having posttraumatic stress disorder (PTSD) as a result of Classmate's harassment. Plaintiffs add that JD's fear of returning to school was so severe that it compelled them to withdraw him from Goddard after fifth grade.

Defendants assert that there is insufficient evidence that their alleged failure to protect JD deprived him of an educational benefit. There is no dispute that JD missed only seven days of school over the two years in question and partook in some activities. These activities included participating in a Model UN Program in which JD traveled to New York City twice and apparently made a speech before hundreds of spectators, playing the recorder during music class, and playing tennis after school. Although there is no evidence that JD's academic performance declined over this time, it is undisputed that Goddard is a Montessori school that does not give traditional grades.

Defendant Board of Education of Prince George's County (the Board) has promulgated a discrimination and harassment policy. This policy is called Administrative Procedure 4170 (AP 4170). AP 4170's purpose is to "provide grievance procedures for student and employee complaints of all forms of discrimination, harassment, bias, or extremism." Doc. No. 36-3 § I.

AP 4170 counsels students to promptly report sexual harassment to school or Board officials. *Id.* §§ V.B.2, VI.C.3. AP 4170 also envisions school officials' forwarding reports of sexual harassment to particular Board offices and contemplates the submission of certain forms to this end. *See id.* § VI.C.5.

On November 10, 2011, Plaintiffs filed their Complaint. Doc. No. 1. Plaintiffs named the Board and Schwab as Defendants. Plaintiffs asserted a Title IX sexual harassment claim, along with state law claims for negligence and gross negligence. In a Memorandum Opinion and Order issued on August 16, 2012, the Court denied Defendants' Motion to Dismiss. After discovery, Defendants filed a 63-page Motion for Summary Judgment (Doc. No. 36) contesting the viability of all of Plaintiffs' claims. Plaintiffs filed a 50-page Response in Opposition and Defendants a lengthy Reply. Doc. Nos. 39, 47. Plaintiffs then filed a short Motion for Leave to File Surreply, which Defendants opposed in a Motion to Strike Plaintiffs' Surreply. Doc. Nos. 52, 53.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only "if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson*, 477 U.S. at 248. Material disputes are those that "might affect the outcome of the suit under the governing law." *Id.* Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, the nonmoving party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *See Beal v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (citation omitted). Further, if a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). Finally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Firefighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III.    LEGAL ANALYSIS

## A.    Title IX

"To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (citation omitted); *see also Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 638–53 (1999). Defendants do not dispute the satisfaction of the first element.

### 1.    Based on Sex

Courts "look to case law interpreting Title VII . . . for guidance in evaluating a claim brought under Title IX." *Jennings*, 482 F.3d at 695 (citations omitted). Under Title VII,

demonstrating that a same-sex harasser's conduct stems from sexual desire suffices to show that the harassment was based on the victim's sex. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Conduct stemming from sexual desire generally includes "explicit or implicit proposals of sexual activity," "objectively offensive touching" of a sexual nature, and "sexually charged comments." *See Oncale*, 523 U.S. at 80; *Davis*, 526 U.S. at 653; *Jennings*, 482 F.3d at 695.

In this case, a reasonable juror could conclude that Classmate's conduct stemmed from sexual desire. Drawing every reasonable inference in Plaintiffs' favor, a reasonable juror could conclude as follows: (1) Classmate grabbed JD and directed humping movements at him in class, Doc. No. 40-21 at 82:10-15; and (2) Classmate exposed himself to JD in class, Doc. No. 40-25 at 71:20 – 72:9; Doc. No. 40-18 at 25:7-20. Plausibly, the evidence may also indicate that (1) Classmate called JD gay at least once, Doc. No. 40-19 at 17:10-14; (2) Classmate made sexual remarks to JD in the bathroom at least once, Doc. No. 40-25 at 101:13-17; (3) Classmate ran into the bathroom half-naked and entered a stall into which JD had taken refuge, Doc. No. 40-25 at 321:12-19; and (4) Classmate pressured JD into having oral and/or anal sex with him in the classroom and/or bathroom. A reasonable juror could conclude that this conduct involves proposals of sexual activity, offensive touching of a sexual nature, and sexually charged comments. Therefore, a reasonable juror could infer that the harassment stemmed from sexual desire.

2.    *Severe or Pervasive*

The next issue is whether a reasonable juror could conclude that Classmate's conduct was severe or pervasive. Under Title VII, sexual harassment is severe or pervasive where, subjectively and objectively, it "alter[s] the conditions of the victim's employment and create[s]

an abusive working environment." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). This standard is both modified and elevated in the context of Title IX. *See Davis*, 526 at 649–53. Under Title IX, a private action for damages "will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633. A victim's access to an educational opportunity or benefit is effectively barred where the harassment "has a concrete, negative effect on [the victim's] ability to participate in a program or activity." *Jennings*, 482 F.3d at 699 (alteration in original) (citation and internal quotation marks omitted). Whether harassment has a concrete, negative effect on the victim's ability to participate in a program or activity "depends on a constellation of surrounding circumstances, expectations, and relationships." *Id.* at 696 (citation and internal quotation marks omitted). Relevant factors include whether the conduct is frequent, severe, threatening, or humiliating. *Id.* (citations omitted). Conduct may be frequent, severe, threatening, and/or humiliating where it involves touching, *Davis*, 526 U.S. at 653; where it causes the victim serious anxiety, fear, or discomfort, *Jennings*, 482 F.3d at 698–99; or where a drop-off in academic performance coincides with the harassment, *Davis*, 526 U.S. at 652. Other relevant factors are the number of individuals involved and the ages of the harasser and victim. *Id.* at 651–52. As to the ages of the harasser and victim, courts must "bear in mind that schools are unlike the adult workplace and that children may regularly interact in a manner that would be unacceptable among adults." *Id.* at 651 (citation omitted). These principles act as "very real limitations on a funding recipient's liability under Title IX." *Id.* at 652. Furthermore, "[p]eer harassment . . . is less likely to satisfy these requirements than is teacher-student harassment." *Id.* at 653.

In this case, the Court need not decide whether a reasonable juror could conclude that Classmate's conduct was sufficiently severe and pervasive to have a concrete, negative effect on JD's participation in a school program or activity. Plaintiffs' evidence supports the inference that Classmate subjected JD to a few instances of sex-charged conduct, including raunchy remarks, lewd gestures, self-exposure and, arguably, inappropriate touching. Plaintiffs' evidence also suggests that this harassment caused JD considerable psychological harm; both a medical doctor and JD's therapist diagnosed him as having PTSD as a result of Classmate's harassment. Doc. No. 40-14 at 6; Doc. No. 40-16 at 32:11-18. Plaintiffs' evidence also supports the inference that Classmate's conduct caused JD to have nightmares, insomnia and, arguably, a recurrence of encopresis. Furthermore, one could reasonably conclude that JD was so afraid of Classmate that he refused to go to school. *See* Doc. No. 40-3 ¶ 9; Doc. No. 40-19 at 86–87. In that vein, JD's mother declares that Classmate's harassment ultimately compelled her to withdraw JD from Goddard after fifth grade. Doc. No. 40-3 ¶ 11. Therefore, drawing all fair inferences in Plaintiffs' favor, one could reasonably conclude that Classmate's conduct had a concrete, negative effect on JD's ability to attend school.[1]

_____

[1] Plaintiffs also maintain that Classmate's harassment had a concrete, negative effect on JD's ability to benefit from a particular program or activity because it prevented him from using the school restroom. *See Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003) (citing *Davis*, 526 U.S. at 650–51) (holding that "physical exclusion or denial of access to facilities" is a means by which plaintiffs can demonstrate deprivation of an educational opportunity). Although this is an interesting argument, Plaintiffs have not submitted sufficient evidence for a reasonable juror to conclude that Classmate's conduct precluded JD from using the restroom. Plaintiffs have submitted evidence of only three sexual incidents in the bathroom: (1) the unspecified sexual remarks that an unidentified person made in early 2008; (2) the incident in which a partially clad Classmate allegedly tried to enter JD's stall; and (3) JD's allegation that Classmate forced sexual acts on him in the bathroom and classroom library. Evidentiary item (1) is sparse and vague and does not even identify Classmate. As the Court discusses later on, the record evidence does not support item (2). Similarly, item (3) rests on a rickety factual foundation. Assuming that forced sex acts took place in the bathroom, they would have taken place after the other two incidents. Irrespective of whether JD felt pressure to submit to these acts, the mere fact that he went to the bathroom suggests that the prior acts did not stop him from using the bathroom. Likewise, although the third incident is a constellation of three alleged encounters, JD returned to the bathroom after a prior sexual assault in the same location. Additionally, although JD stated that he was afraid to enter the

Defendants respond that this harm, however harsh, did not have a concrete, negative effect on JD's participation in a program or activity per se. Defendants construe Title IX's prohibition against "discrimination under any education program or activity" for the narrow proposition that, to be actionable, the discrimination must have deprived the student from participating in, or benefiting from, a particular educational program or activity. *See generally* 20 U.S.C. § 1681(a). Defendants then conclude that, because JD participated in various activities and showed no objective signs of an academic drop-off, Plaintiffs have not shown that the harassment precluded JD from participating in, or benefiting from, a particular program or activity. Although Defendants' observations are not without force, harassment sufficiently severe to compel a child to withdraw from school would seem to subsume the deprivation of the participation in, or benefits of, a particular program or activity. *Cf. Davis*, 526 U.S. at 652 ("In the context of student-on-student harassment, damages are available only where the behavior . . . denies its victims the equal access to education that Title IX is designed to protect."). Furthermore, at least one circuit decision proposes that severe harassment that culminates in withdraw from school constitutes the deprivation of the participation in, or the benefits of, a program or activity. *See Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 256–57 (6th Cir. 2000).

For these reasons, the Court is unprepared to conclude that harassment that has no tangible effect on a student's participation in a particular program or activity, but that compels the child to withdraw from school, is unactionable under Title IX. However, the Court need not definitively decide this question because, as the subsequent discussion demonstrates, Plaintiffs have not established a basis for institutional liability.

---

bathroom at the same time as Classmate, he testified that a nurse told him that he could use the bathroom in or near her office. *See* Doc. No. 40-18 at 34:1-11.

3. *Institutional Liability*

Under Title IX, a recipient of federal funding may incur liability for peer-to-peer sexual harassment only where two conditions are satisfied. First, the recipient must display "deliberate indifference" to the sexual harassment. *Davis*, 526 U.S. at 650. Second, the recipient must have "actual knowledge" of the harassment. *Id.* Genuine factual disputes clearly surround the question whether Defendants had actual knowledge of the harassment. Therefore, except as otherwise noted, the Court focuses on whether a reasonable juror could conclude that Defendants displayed deliberate indifference in their response to Plaintiffs' allegations of sexual harassment.

Under Title IX, a funding recipient may not incur liability for peer-to-peer sexual harassment unless it is deliberately indifferent to such harassment. A funding recipient is deliberately indifferent to known acts of sexual harassment "only where the recipient's response . . . is clearly unreasonable." *Id.* at 648. This "high standard" precludes a finding of deliberate indifference in all but "limited circumstances." *Cf. id.* at 643. In appropriate cases, courts may identify a funding recipient's response as "not clearly unreasonable as a matter of law." *See id.* at 649 (internal quotation marks omitted).

In this case, no reasonable juror could conclude that Defendants' response to the harassment was clearly unreasonable. Plaintiff has identified six primary instances in which Classmate allegedly sexually harassed JD: (1) Classmate called JD gay at least once; (2) Classmate grabbed JD and humped him in class; (3) Classmate exposed himself to JD in class; (4) someone made sexual remarks to JD in the bathroom at least once; (5) Classmate ran into the bathroom half-naked and entered JD's stall; and (6) Classmate had oral and/or anal sex with JD in the classroom and/or bathroom on three occasions. In response to the self-exposure incident, Schwab talked to JD and JD suggested that, although Classmate had made a sexual gesture, he

had not actually exposed himself. *See* Doc. No. 40-25 at 70–73. Although the incident transpired in December 2008 before winter break, JD failed to inform Schwab of this incident until late January 2009. *See* Doc. No. 40-2 at 1; Doc. No. 40-25 at 75. In any event, Schwab documented JD's complaint in a contemporaneous log and reported it to Johnson. *See* Doc. No. 40-25 at 74, 79. Subsequently, Jellison rearranged her class such that JD and Classmate were as far away from each other as possible and that Jellison had more visibility. *See* Doc. No. 40-21 at 75, 77–78. No reasonable juror could find these measures clearly unreasonable. A lesser standard would undermine the policy against suspending or expelling every student accused of sexual harassment and divest school administrators of the flexibility to craft tailored responses to allegations of inappropriate conduct. *Cf. Davis*, 526 U.S. at 48.

Nor could a reasonable juror conclude that Defendants' response to the humping incident was clearly unreasonable. The record reflects, and Plaintiffs concede, that Defendants documented this incident as sexual harassment and served Classmate with a five-day in-school suspension for it. *See* Doc. No. 40-5. Defendants assert, and Plaintiffs do not contest, that the suspension was served in Johnson's office. Defendants further assert, and Plaintiffs do not contest, that Johnson returned Classmate to the classroom only after conferring with Classmate and his parents. If such responses were clearly unreasonable, then "nothing short of expulsion of every student accused of misconduct involving sexual overtones would protect school systems from liability or damages." *Davis*, 526 U.S. at 648 (citation and internal quotation marks omitted). This outcome would deprive school administrators of the flexibility to employ tailored responses to sexual harassment and run counter to the strong national policy in favor of educating children. *Cf. id.*; *Plyler v. Doe*, 457 U.S. 202, 222–23 (1982). Accordingly, Defendants' response to the humping incident was not clearly unreasonable.

Nor was Defendants' response to the bathroom stall incident clearly unreasonable. In response to JD's allegations, Defendants interviewed two or three male students, all of whom evidently stated that they had not seen JD and Classmate together in the bathroom at the relevant time. *See* Doc. No. 40-25 at 331. Subsequently, JD's father and a security officer watched video surveillance footage of the bathroom's entrance and found no clear proof that JD and Classmate had been in the bathroom at the same time. Doc. No. 37-5 at 323. Despite the lack of corroborating evidence, Defendants implemented a sign-in/sign-out procedure and provided JD with a student escort to the bathroom. JD, however, decided that he "no longer wanted someone to attend the restroom with him." Doc. No. 37-6 at 27. Furthermore, although Plaintiffs dispute the effectiveness of the sign-in/sign-out procedure, they overlook the presence of evidence contradicting JD's allegation that Classmate had entered his stall partially nude. *Cf. See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). In short, there is inadequate evidence that Classmate tried to climb into JD's stall half-naked. Even assuming the truth of this allegation, Defendants took reasonable measures to protect JD from further such incidents. Accordingly, no reasonable juror could conclude that Defendants' response to the bathroom incident was clearly unreasonable.

Defendants could not have acted in a clearly unreasonable manner as to JD's allegations that Classmate had oral and/or anal sex with him in the classroom and/or bathroom. As JD made these allegations after he had stopped attending Goddard, Defendants lacked actual notice of them. Furthermore, JD recanted these allegations and stated that he consensually engaged in the sexual acts with Classmate. Although Plaintiffs have created an issue of fact on whether JD lied

to the detective, Defendants nonetheless lacked actual notice of these incidents. Thus, as a matter of law, Defendants had no duty to respond to these incidents.

Plaintiffs' assertion that Defendants acted with clear unreasonableness in response to JD's allegations that Classmate called him gay and made inappropriate remarks also lacks merit. Regarding the allegation of homophobic remarks, the Court preliminarily observes that the caselaw is unsettled on whether simply calling a person gay constitutes harassment "because of" sex. *Cf. Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1066 (7th Cir. 2003) (Posner, J., concurring) (citing cases) (noting that "[t]he case law as it has evolved holds . . . that although Title VII does not protect homosexuals from discrimination on the basis of their sexual orientation, it protects heterosexuals who are victims of 'sex stereotyping' or 'gender stereotyping.'"). All the same, one could not reasonably infer that the alleged homophobic comments were sufficiently pervasive to constitute sexual harassment, or that Defendants' failure to implement particular responses to them caused the complained-of harm. JD does not testify that Classmate called him gay, Doc. No. 40-18 at 13–15, and JD's father's testimony that Classmate called JD gay is inadmissible hearsay. *See* Doc. No. 40-19 at 17–18, 60–62; *cf.* Fed. R. Evid. 802. Although Jellison vaguely recollects unidentified "people" calling JD gay, she suggests that this type of behavior was commonplace in her classroom. *See* Doc. No. 40-21 at 103. Thus, assuming there is admissible evidence that Classmate called JD gay, it is just an example of the "dizzying array of immature behaviors by students." *See Davis*, 526 U.S. at 651; *see also id.* at 652 ("Damages are not available for simple acts of teasing and name-calling among school children . . . ."). Furthermore, assuming the truth of this allegation, JD's father's testimony indicates that the conduct took place relatively early in the 2008-2009 school year. Yet the lion's share of the complained-of injuries occurred no earlier than February 2010. For

instance, the evidence indicates that JD's encopresis did not come back until February 2010, and JD did not leave Goddard until May or June of the same year. Although the exact timing of the other injures is uncertain, they did not occur any earlier than JD's fifth grade year. *See, e.g.*, Doc. No. 40-3 ¶ 7. Thus, no reasonable juror could conclude that the effete evidence of homophobic epithets engendered JD's injuries. Plaintiffs' assertion that Defendants responded in a clearly unreasonable fashion to the allegation of sexual remarks fails for similar reasons. Plaintiffs' evidence that someone made unspecified sexual remarks to JD is sparse and vague, and there is no discernible causal link between these remarks and the harm of which JD complains. To the extent a response was in order, the remedial measures discussed above, including Schwab's instructing JD to tell his teacher of any further such incidents, sufficed.

Plaintiffs' counterarguments lack merit. Plaintiffs argue that Defendants displayed deliberate indifference by failing to move JD to another classroom. To support this argument, Plaintiffs assert, and Defendants do not contest, that another fourth-through-sixth-grade class was available. Plaintiffs also note that Jellison testified that she was surprised that JD and Classmate were both placed back in her class for JD's fifth-grade school year. Yet no more than three alleged instances of sexual harassment took place in the classroom: (1) the self-exposure incident; (2) the humping incident; and, allegedly, (3) one of the three sexual assaults. Defendants lacked notice of the sexual assault and, hence, could not have been deliberately indifferent to it. Furthermore, it is unclear how putting either JD or Classmate in a different classroom would have prevented the bathroom incidents. Classmate's capacity to enter the bathroom at the same time as JD presumably did not depend on their assignment to the same class, and Plaintiffs have presented no contrary evidence or argument. Plaintiffs might respond that transferring Classmate would have prevented the sexual assault in the classroom library.

However, JD does not testify that any of the assaults took place in the classroom, and Classmate's contradictory allegation is inadmissible double hearsay. Granted, Classmate's suspect statement, per se, may be admissible as a business and/or public record. *See* Fed. R. Evid. 803(6), (8). Nonetheless, Plaintiffs have identified no exception applicable to the allegations it embodies, and the Court knows of none. *See* Fed. R. Evid. 805 (providing that "[h]earsay within hearsay" is excluded by the rule against hearsay unless an exception applies).[2] Hence, the evidence does not show that Classmate sexually assaulted JD in the classroom. Consequently, a reasonable juror could not even conclude that assigning Classmate to a different class would have stopped the in-class sexual assault. Additionally, the remaining classroom incidents occurred no later than March 2009. But the vast bulk of JD's injuries appeared no earlier than February 2010, and absolutely no earlier than the fall of 2009. Given this considerable time lag, one cannot soundly infer that Defendants' failure to implement Plaintiffs' preferred remedial measure caused JD's injuries. Besides, Defendants responded swiftly and significantly to the in-class incidents of which they had knowledge. Therefore, Defendants had reason to believe that they would be able to control Classmate's conduct. Indeed, the evidence does not indicate that Classmate sexually harassed JD in class after the March 2009 humping incident. In fact, other than the dubious stall incident, Plaintiffs reported no further instances of sexual harassment after March 2009.

---

[2] *See also United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975) ("[P]rior unsworn statements of a witness are mere hearsay and are, as such, generally inadmissible as affirmative proof."); *United States v. Burruss*, 418 F.2d 677, 678 (4th Cir. 1969) (reasoning that witness statements to police officers are usually inadmissible double hearsay); *United States v. Fabio*, 394 F.2d 132, 133–34 (4th Cir. 1968) (citation omitted) (finding inadmissible police report containing description of robbers furnished by witness who could have been examined on this point); *Ramrattan v. Burger King Corp.*, 656 F. Supp. 522, 529–30 (D. Md. 1987) (holding that officer's recorded comments of witnesses he interviewed in connection with an accident were inadmissible as either business or public records).

The argument that Defendants displayed deliberate indifference by failing to transfer JD's harasser to a different class also fails inasmuch as it calls on this Court to micromanage Defendants. *Davis* makes clear, however, that Title IX plaintiffs lack the "right to make particular remedial demands." 526 U.S. at 648 (citing *New Jersey v. T.L.O.*, 469 U.S. 325, 342–43 & n.9 (1985)). This rule conforms to the longstanding realization that "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 208 (1982) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973)). Reading Title IX to require federal courts to second-guess what is, at most, a debatable administrative decision would invite an avalanche of Title IX litigation and risk resultant financial harm to school districts. *Cf. Saleh v. Upadhyay*, 11 F. App'x 241, 258 (4th Cir. 2001) (citation and internal quotation marks omitted) (suggesting that "federal courts have neither the competency nor the resources to . . . micromanage . . . thousands of state educational [decisions]"). Accordingly, no reasonable juror could conclude that Defendants were deliberately indifferent by not moving Classmate or JD to another classroom.

Plaintiffs also argue that Defendants' failure to follow the procedures set forth in AP 4170 displays deliberate indifference. The salient flaw in this argument is that the Supreme Court has held that the failure to follow sexual harassment grievance procedures does not prove deliberate indifference under Title IX. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–92 (1998). Furthermore, Plaintiffs' argument would fail even if such omissions were probative of deliberate indifference. Although there is unrefuted evidence that Defendants failed to fill out incident forms and forward them to the designated Board office in connection with Plaintiffs' complaints, these procedural shortcomings do not diminish the substantive impact of

all the steps Defendants took in response to JD's complaints. Moreover, Schwab did heed some of AP 4170's procedures in her handling of JD's complaints, such as by telling him that students were supposed to treat each other with respect and that he should inform his teacher of any incidents of harassment. *See, e.g.*, Doc. No. 36-3 § II ("Members of the school community are expected to treat each other with mutual respect . . . ."). Therefore, one can distinguish this case from those (noncontrolling) decisions proposing that "a wholesale failure to employ established procedures for investigating sexual harassment complaints" may be probative of deliberate indifference. *See Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 211 (D.N.H. 2009) (citations omitted). Additionally, Plaintiffs disregard evidence that they failed to comply with AP 4170 to the letter, such as by failing to report, or to promptly report, some the instances of harassment. *See* Doc. No. 36-3 § V.B.2 ("A student who believes that he or she is being or has been subjected to discrimination or harassing acts or conduct should bring such acts or conduct to the prompt attention of [school officials]."). Therefore, Defendants' deviations from AP 4170 do not give rise to deliberate indifference.

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' Title IX, peer-on-peer sexual harassment claim. In so doing, the Court is by no means condoning Classmate's conduct. The issue, however, is not whether Classmate sexually harassed JD, but rather, whether Defendants evinced such clearly unreasonable conduct in responding to Plaintiffs' allegations that they "effectively cause[d] the discrimination." *Davis*, 526 U.S. at 642–43 (alteration in original) (citations and internal quotation marks omitted). After carefully reviewing the evidentiary record, perusing the Parties' lengthy memoranda, and

holding a motions' hearing, the Court is convinced that Plaintiffs have failed to satisfy this "high standard." *Cf. id.* at 643.[3]

## B.    Gross Negligence

This Court has previously stated the standard for gross negligence under Maryland law. "Gross negligence connotes 'wanton and reckless disregard for others.'" *Markevicz v. Garcia*, Civil Action No. 8:08–cv–02877–AW, 2011 WL 6888641, at *2 (D. Md. Dec. 29, 2011) (quoting *Boyer v. State*, 594 A.2d 121, 132 (Md. 1991)). "A defendant acts with wanton and reckless disregard for others 'only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.'" *Id.* (emphasis added) (quoting *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007)).

In this case, no reasonable juror could conclude that Defendants intentionally inflicted JD's injury or acted as if JD's rights did not exist. Plaintiffs have not proceeded under the theory that Defendants intentionally inflicted JD's injury and, even had they, their evidence would be insufficient to support such a conclusion. Although Plaintiffs argue that Defendants' response to the allegations of harassment displayed utter indifference to JD's rights, this argument fails for the reasons stated in Part III.A. Quite the contrary, Defendants acknowledged that JD had a right to be free from Classmate's sexual harassment, investigated at least some of Plaintiffs'

---

[3] Plaintiffs cite a handful of incidents in which Classmate allegedly bullied JD, such as when Classmate encouraged his fellow students not to talk to JD and made a "harassing" remark to JD near the water fountain. Plaintiffs maintain that Defendants' alleged failure to respond adequately to these incidents shows deliberate indifference. The Court disagrees. First of all, as these incidents did not involve sexual conduct, they are largely irrelevant to Plaintiffs' Title IX sexual harassment claim. Plaintiffs seem to argue that, had Defendants conducted an investigation, they would have discovered that these incidents amounted to sexual harassment and/or that there were other instances of sexual harassment. Yet the record clearly reflects that these incidents did not involve sexual conduct, and the idea that an investigation would have uncovered other incidents of sexual harassment is speculative. Moreover, the record evidence, including Plaintiffs' own deposition testimony, reflects that Defendants responded to many of these incidents. *See, e.g.*, Doc. No. 37-4 at 36–37; Doc. No. 37-6 at 20. In short, Plaintiffs' evidence concerning bullying is immaterial, and the record reflects that Defendants responded to many, if not all, of the key bullying incidents. Consequently, this evidence creates no triable issues.

complaints, and took steps to remedy the harassment. Accordingly, Plaintiffs' gross negligence claim fails as a matter of law.[4]

## C.    Negligence

Under Maryland law, the elements of negligence are well-settled. To state a claim for negligence, a plaintiff must plead and prove facts showing "a duty owed to him (or to a class of which he is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages." *Jacques v. First Nat'l Bank*, 515 A.2d 756, 758 (Md. 1986). Although Defendants argue otherwise, the Court concludes that they owed JD a duty to exercise reasonable care to protect him from student-on-student sexual harassment. *See Lunsford v. Bd. of Educ. of Prince George's Cnty.*, 374 A.2d 1162, 1168 (Md. 1977) (citations omitted); *cf. Davis*, 526 U.S. at 644 (citations omitted) ("The common law . . . has put schools on notice that they may be held responsible under state law for their failure to protect students from the tortious acts of third parties."). Furthermore, a reasonable juror could conclude that JD suffered injuries on account of the alleged harassment. Therefore, the Court analyzes (1) whether Defendants breached their duty to protect JD from the sexual harassment and (2) whether Defendants' alleged breach caused JD's injuries.

In this case, no reasonable juror could conclude that Defendants failed to exercise ordinary care to protect JD from Classmate's harassment. As explained above, Defendants took swift and substantial action in response to the self-exposure and humping incidents, including rearranging the classroom and suspending Classmate. As to the bathroom stall incident, Defendants took significant steps to ensure that JD and Classmate would not be in the bathroom at the same time despite having reason to believe that the incident never occurred. Although

---

[4] Notably, Plaintiffs devote two sentences of their 50-page Response in Opposition to argue that summary judgment on their gross negligence claim is improper. *See* Doc. No. 39 at 48.

Plaintiffs assert that these steps were inadequate, it is unclear what else Defendants could have done, or that any more measures would not have proved overly burdensome. *Cf. Boyer*, 594 A.2d at 137 ("[An official's] conduct should be judged not by hindsight but should be viewed in light of how a reasonably prudent [official] would respond faced with the same difficult . . . situation."); *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (reasoning that the "burden of adequate precautions" is a factor in determining whether a party has breached the duty of reasonable care). Defendants' purported failure to respond to the allegation that Classmate subjected JD to oral and/or anal sex in the classroom and/or bathroom does not prove breach because Defendants lacked actual notice of these acts. Although Plaintiffs assert that Defendants had inquiry and/or constructive notice of these acts, Plaintiffs have failed to show that Defendants had "'knowledge of such facts and circumstances as would lead [them], by the exercise of due diligence, to a knowledge of the [acts].'" *Cf. Chesapeake Bay Found., Inc. v. Weyerhaeuser Co.*, 848 F. Supp. 2d 570, 580 (D. Md. 2012) (quoting *Poffenberger v. Risser*, 431 A.2d 677, 680 (Md. 1981)). As noted, the only admissible evidence is that these acts took place in the bathroom when JD was in the fifth grade. However, the bathroom stall incident was the only instance of sexual harassment that Plaintiffs reported that year. Out of the four instances that occurred before then, two involved vague remarks that Plaintiffs have not adequately linked to Classmate. And, although Plaintiffs have substantiated the self-exposure and humping incidents, they happened in class no later than March 2009 and were responded to. Therefore, one could not reasonably conclude that Defendants had inquiry and/or constructive notice of the alleged bathroom assaults. Additionally, while violations of administrative procedures may be probative of negligence, the Maryland Court of Appeals has cautioned against overreliance on administrative procedures as a source of substantive duties. *Compare Volkswagen of Am. v.*

*Young*, 321 A.2d 737, 746 (Md. 1974) ("[S]tatutory or regulatory requirements are deemed to furnish standards by which courts or juries determine, **along with other circumstances**, whether or not conduct is negligent.") (emphasis added), *with Massey v. Sec'y, Dep't of Pub. Safety and Corrs. Servs.*, 886 A.2d 585, 599 (Md. 2005) (citations and internal quotation marks omitted) ("[T]o carry the procedural rule-making requirements too far into the internal workings of the agency would completely stifle agency activities if it were enforced."); *cf. Bishop v. Wood*, 426 U.S. 341, 349–50 (1976) ("We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs."). Here, the "other circumstances" heavily weigh against the conclusion that Defendants breached the duty of care. *See* Part III.A.3.

Nor does the unsworn expert report of Plaintiffs' expert, Susan Strauss, create genuine issues for trial on Plaintiffs' negligence claim. For starters, it is well-established at both the circuit level and in this District that unsworn expert reports are inadmissible on summary judgment.[5] Nor did Strauss sign her report "under penalty of perjury." *See* 28 U.S.C. § 1746 (providing that an unsworn declaration signed under the penalty of perjury may substitute for a sworn declaration). Granted, district courts have discretion to allow a party to supplement a deficient expert report. *See DG&G, Inc. v. FlexSol Packaging Corp. of Pompano Beach*, 576 F.3d 820, 826 (8th Cir. 2009). However, this measure would be futile. The report embodies Strauss's opinion that Defendants did not adequately respond to Plaintiffs' allegations of harassment. Strauss bases her opinion on various factual contentions and Defendants' alleged

---

[5] *See Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 n.1 (6th Cir. 2010) (citation omitted); *Edens v. Kennedy*, 112 F. App'x 870, 879 (4th Cir. 2004); *Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003); *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003); *Provident Life and Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) (citation omitted); *Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989) (citation omitted); *In re Eternity Shipping, Ltd., Eurocarriers, S.A. for Exoneration from or Limitation of Liab.*, 444 F. Supp. 2d 347, 363 (D. Md. 2006); *Turner v. Human Genome Sci., Inc.*, 292 F. Supp. 2d 738, 743 (D. Md. 2003) (citations omitted); *Collier v. Ram Partners, Inc.*, 159 F. Supp. 2d 889, 893 (D. Md. 2001) (citation omitted); *Solis v. Prince George's County*, 153 F. Supp. 2d 793, 799 (D. Md. 2001) (citation omitted).

failure to follow various administrative procedures. But the evidence fails to support and/or contradicts many of the factual contentions on which Strauss bases her conclusions. For instance, regarding the self-exposure incident, Strauss asserts that "Classmate placed JD's hand on [his] exposed penis . . . ." *See* Doc. No. 40-9 at 3. Then, Strauss makes the unsupported assertion that "Classmate forced JD to touch him inappropriately several additional times in the 2008-09 school year and JD reported these incidents . . . ." *Id.* As detailed above, Strauss makes the questionable claim that "Classmate tried to climb into JD's bathroom stall." *Id.* Strauss continues with the unfounded contention that "Classmate . . . threatened JD that Classmate would tell a girl that JD liked her unless he would engage in sexual activity with him." *Id.* Additionally, Strauss makes the unsupported assertion that the text messages Classmate sent to JD "discussed JD and Classmate's sexual harassment in the bathroom." *Id.* at 4. Therefore, one must question whether Plaintiffs have adequately shown that Strauss's opinion is "based on sufficient facts" and "the product of reliable principles and methods." *Cf.* Fed. R. Evid. 702. Even if this deficiency goes to the weight of Strauss's opinion rather than its admissibility, Strauss's core conclusion is simply that Defendants' failure to follow various administrative procedures and protocol in response to Plaintiffs' complaints was improper. However, Strauss, like Plaintiffs, overstates Defendants' failure to follow AP 4170. Moreover, many of the rules, regulations, and procedures that Strauss discusses are inapplicable. *See, e.g.*, Doc. No. 40-9 at 5–14. Thus, Strauss's opinions are insufficient for a reasonable juror to conclude that Defendants breached the duty of care.

Even if a reasonable juror could conclude that Defendants breached their duty to exercise reasonable care to protect JD from Classmate's harassment, no reasonable juror could conclude that said breach caused JD's injuries. "It is a basic principle that '[n]egligence is not actionable unless it is a proximate cause of the harm alleged.'" *Falade v. Beverage Capital Corp.*, Civil

Action No. 8:10–cv–02047–AW, 2012 WL 1405720, at *3 (D. Md. Apr. 20, 2012) (alteration in original) (quoting *Pittway Corp. v. Collins*, 973 A.2d 771, 786 (Md. 2009)). "Under Maryland law, proximate cause has two separate requirements." *Id.* "It must be both a 'cause in fact' and 'a legally cognizable cause.'" *Id.* (quoting *Collins*, 973 A.2d at 786).

"Causation-in-fact concerns the threshold inquiry of whether [the] defendant's conduct actually produced an injury." *Collins*, 973 A.2d at 786 (citation and internal quotation marks omitted). "Two tests have developed to determine if causation-in-fact exists, the but for test and the substantial factor test." *Id.* (citation omitted). "The 'but for' test applies in cases where only one negligent act is at issue." *Id.* Under this test, "a party must show that the event 'would not have occurred absent or "but for" the defendant's negligent act.'" *Falade*, 2012 WL 1405720, at *3 (quoting *Collins*, 973 A.2d at 786–87).

"When two or more independent negligent acts bring about an injury, however, the substantial factor test controls." *Collins*, 973 A.2d at 787. Under this test, "[c]ausation-in-fact may be found if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id.* (citations omitted). The following considerations are important, either individually or collectively, in determining whether the actor's conduct is a substantial factor in bringing about harm to another:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces of which the actor is not responsible;
>
> (c) lapse of time

*See id.* (citation omitted). Although causation is generally a factual question for the jury, "it becomes a question of law in cases where reasoning minds cannot differ." *Id.* at 792 (citation and internal quotation marks omitted).

Plaintiffs' claim fails under either the "but for" or "substantial factor" test. Under the but for test, no reasonable juror could conclude that JD's injuries would not have occurred but for Defendants' alleged inaction. There is no indication that Classmate would not have continued to harass JD had Defendants done more to protect him. Short of expulsion, it is unclear what more Defendants could have done to control Classmate's behavior, and JD rejected measures designed to protect him from Classmate's alleged harassment in the bathroom. Plaintiffs counter that Defendants should have put Classmate in a different classroom. This argument fails for the reasons stated in Part III.A.3. Because the alleged sexual assaults happened in the bathroom, it is unclear how transferring Classmate to a different class would have stopped them. Indeed, JD testified that he continued to use the bathroom even though the nurse told him that he could use the bathroom in or near her office. Plaintiffs also asserted at the hearing that Defendants could have given Classmate an escort to the bathroom. However, given the hustle and bustle of an elementary school and Classmate's alleged incorrigibility, it is unlikely that Classmate would not have managed to slip into the bathroom unescorted. Furthermore, although removing Classmate from the class after the self-exposure incident conceivably could have prevented the humping incident, there is an insufficient link between the humping incident and the harm at hand, none of which occurred until JD was in the fifth grade. Moreover, JD texted with Classmate, continued to use the bathroom in question, and stated that their sex acts were consensual. These facts suggest that, at least to an extent, JD welcomed such conduct. Thus, no reasonable juror could conclude that JD's injuries would not have occurred had Defendants done more to protect him.

Plaintiffs' negligence claim also fails under the substantial factor test. Assuming that Defendants' alleged inaction played a role in causing JD's harm, no reasonable juror could conclude that its effect was substantial. Classmate's uncontrollable conduct and JD's voluntary decision to associate with him far outweigh the effect of Defendants' inaction in engendering JD's injuries. Plaintiffs have identified six instances in which Classmate allegedly sexually harassed JD. Defendants responded readily and robustly to the self-exposure and humping incidents. The bathroom stall incident stands on infirm factual footing. Although the Parties dispute whether Defendants responded to the gay-bashing and sexual remarks incidents, they were minor and temporally distant from the at-issue harm. And Defendants had no notice of the alleged sexual assaults in the bathroom and no reason to believe that they would occur. For similar reasons, one could not reasonably conclude that Defendants' alleged inaction is the legally cognizable cause of JD's harm. On the facts presented, it is simply unforeseeable that Defendants' failure to do more would have led to sexual assaults in the bathroom and the resultant injuries. *See generally Collins*, 973 A.2d at 787–88 (discussing the requirements of legal causation and its connection to the concept of foreseeability).

Even if Defendants' alleged inaction proximately caused JD's injuries, a reasonable juror could only conclude that JD acted with contributory negligence. Maryland continues to recognize the doctrine of contributory negligence. *See Harrison v. Montgomery Cnty. Bd. of Educ.*, 456 A.2d 894, 905 (Md. 1983). It is well-settled that "a plaintiff who fails to observe ordinary care for his own safety is contributorily negligent and is barred from all recovery, regardless of the quantum of a defendant's primary negligence." *Id.* at 898 (citations omitted). In Maryland, "a child, five years of age or over, may be guilty of contributory negligence." *Taylor v. Armiger*, 358 A.2d 883, 889 (Md. 1976) (citation and internal quotation marks omitted).

Children of tender years act with contributory negligence where they fail "to use that degree of care which ordinarily prudent children of that age and like intelligence are accustomed to use under the circumstances . . . ." *Id.* (citation and internal quotation marks omitted). Although contributory negligence is generally a question of fact, "[t]he Maryland courts have not hesitated to find a plaintiff contributorily negligent as a matter of law where common experience reveals the foreseeable dangers of the plaintiff's actions." *Reid v. Wash. Overhead Door, Inc.*, 122 F. Supp. 2d 590, 593–94 (D. Md. 2000) (citations omitted); *see also S. Md. Elec. Co-op. v. Blanchard*, 212 A.2d 301, 304 (Md. 1965) ("[In] certain cases the facts establish that . . . a plaintiff has been guilty of contributory negligence[] as a matter of law."); *Pfaff v. Yacht Basin Co., Inc.*, 473 A.2d 479, 483–84 (Md. Ct. Spec. App. 1984) (affirming trial court's decision that party was contributorily negligent as a matter of law); *McSlarrow v. Walker*, 467 A.2d 196, 200–01 (Md. Ct. Spec. App. 1983) (citing *Yockel v. Gerstadt*, 140 A. 40 (Md. 1927)) (holding that courts may find a party contributorily negligent was a matter of law.).

In this case, a reasonable juror could only conclude that JD was contributorily negligent. Even though Classmate had allegedly made sexual comments to him in the bathroom and tried to enter his stall half-naked, JD willfully discontinued the escort system designed to protect him from Classmate. Furthermore, other than perhaps the questionable stall incident, JD failed to report the bathroom sexual assaults even though Schwab had told him to report such conduct. Likewise, JD's decision to enter the bathroom after the first alleged sexual assault constitutes a gross failure "to avoid a known obvious danger in a [bathroom]." *See Neely v. Brewer*, 71 A.2d 872, 873 (Md. 1950) (citations omitted). For the same reason, a reasonable juror could only conclude that JD assumed the risk of being sexually assaulted again when he reentered the

bathroom.[6] Plaintiffs presumably would respond that JD did not voluntarily accept the risk of

being sexually assaulted because his health depended on using the bathroom. *See Martin*, 702

A.2d at 735 (citation and internal quotation marks omitted) ("The plaintiff's acceptance of a risk

is not voluntary if the defendant's tortious conduct has left him no reasonable alternative course

of conduct in order to . . . exercise . . . a right or privilege of which the defendant has no right to

deprive him."). However, as JD testified that the nurse offered him to use the bathroom in or near

her office, he had a reasonable outlet to relieve himself. Additionally, JD's since recanted

statement that the acts were consensual and texting of Classmate cut against the inference that

his decision to reenter the bathroom was not voluntary. True, Plaintiffs dispute whether JD lied

to the investigator. However, the Court's conclusion that JD acted with contributory negligence

does not turn on whether JD consented to these acts. Moreover, the record contains considerable

evidence that JD made several inconsistent statements to school officials, his parents, and the

investigator regarding Classmate's alleged harassment. Therefore, despite his relative youth, the

evidence compels the conclusion that JD failed to use the degree of care that ordinarily prudent

children of his age and like intelligence use under the same or similar circumstances.[7][8]

---

[6] *See generally ADM P'ship v. Martin*, 702 A.2d 730, 734 (Md. 1997) (citation and internal quotation marks omitted) ("[T]o establish the defense of assumption of risk, the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger."); *see also Sacks v. Pleasant*, 251 A.2d 858, 862 (Md. 1969) (citations omitted) (observing that "the same facts may support a contention of contributory negligence and of assumption of the risk"); *Pfaff*, 473 A.2d at 483–84 (affirming trial court's decision that, on the same set of facts, the plaintiff was contributorily negligent and assumed the risk of his actions).

[7] Plaintiffs devoted only three pages of a 50-page Response in Opposition to defending their negligence claim. *See* Doc. No. 39 at 46–49. In this short space, they do not meaningfully address whether Defendants' alleged failures in responding to the nonsexual bullying incidents create genuine disputes of material fact. All the same, the Court concludes that Defendants' alleged failures create no such issues.

[8] Defendants argue, and Plaintiffs do not appear to contest, that Schwab committed the challenged conduct in the scope of her employment. The Court agrees and concludes as a matter of law that Schwab took the challenged actions in the scope of her employment. Therefore, even had Plaintiffs stated a viable negligence claim against her, Maryland law would require the Board to satisfy any judgment levied against her. *See* Md. Code. Ann., Cts. & Jud. Proc. § 5-518(e); *Bd. of Educ. of Prince George's Cnty. v. Marks-Sloan*, 50 A.3d 1137, 1149–56 (Md. 2012).

**D.      Other**

The Court denies as moot Plaintiffs' Motion for Leave to File Surreply. "[S]urreplies are disfavored in this District[] and the surreply would not alter the Court's analysis." *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013). As a result, the Court denies as moot Defendants' Motion to Strike Plaintiffs' Surreply.

**IV.      CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment, **DENIES AS MOOT** Plaintiffs' Motion for Leave to File Surreply, and **DENIES AS MOOT** Defendants' Motion to Strike Plaintiffs' Surreply.

| November 18, 2013 | /s/ |
|---|---|
| Date | Alexander Williams, Jr. |
| | United States District Judge |